# THE STATE v. CHARLES ELSCHINGER, Appellant.

**Division Two, November 23, 1909.**

1. **BILL OF EXCEPTIONS: Filed After Expired Time: Nunc Pro Tunc Order.** An order made on May 5th, granting defendant ninety days in which to file a bill of exceptions, expired on August 3rd, and the court had no jurisdiction to make an order on August 5th extending the time, and no jurisdiction at the September term to make a *nunc pro tunc* order as of the date of August 5th extending the time to the 5th day of the October term in which to file his bill. And however serious the consequences may be to defendant, the court cannot consider his exceptions.

2. **NO EXCEPTIONS: No Error in Record.** Where there is no bill of exceptions that can be considered on appeal, because not filed in time, and there is no error in the record proper, the only duty of the appellate court is to indulge the presumption that the trial court performed its duty and gave defendant a fair and impartial trial.

Appeal from St. Louis City Circuit Court.—*Hon. Geo. H. Williams,* Judge.

AFFIRMED.

*Henry M. Walsh* for appellant.

*Elliott W. Major,* Attorney-General, and *James T. Blair,* Assistant Attorney-General, for the State.

(1) The indictment is sound. In all but the names used it is a rescript of that approved in the cases of State v. Gray, 172 Mo. 434; State v. McNamara, 212 Mo. 156. It is practically identical with the form of the indictments approved in the cases of State v. Evans, 158 Mo. 592; State v. Wilson, 172 Mo. 423. (2) The arraignment and plea, the oath and impanelment of the jury, the verdict, and sentence all appear

in proper form in the record. For two reasons the bill was filed out of time: 1. There was no valid basis for the *nunc pro tunc* entry of September 5, 1908. A new term of court had intervened since the first extension of time, and the court's inherent power to amend and revive its records was gone. State v. Libby, 203 Mo. 599. Further, the affidavit of defendant's counsel is not sufficient to support a *nunc pro tunc* entry of this character. A minute of the judge or clerk, made at the time, or a paper in the case is required. State v. Libby, 203 Mo. 597. It may further be observed that the *nunc pro tunc* order is conditional, and no evidence of the fulfillment of the condition appears in the record. (2) Conceding the validity of the *nunc pro tunc* order, it is insufficient. The time for filing the bill of exceptions expired August 3, 1908. The order entered upon affidavit of defendant's counsel is merely an effort to resurrect, on August 5, 1908, a right to file, which perished on August 3d. The order provides that the bill may be filed, and that "when so filed the same is to have the same force and effect as if filed on the fifth day of August, 1908." The *nunc pro tunc* order, at the most, could have no greater force than an order originally entered on the date fixed in the *nunc pro tunc* entry. And an order entered on August 5th, if it had actually been entered then, would have availed defendant nothing, since the time for filing the bill under the original extension expired August 3, 1908. State v. Eaton, 191 Mo. 153; Bank v. Barber, 145 Mo. 366. (3) For the reasons suggested the bill was not filed in time and cannot be considered. Matters of exception not being reviewable, and the record proper being free from error, the judgment should be affirmed. State v. Foley, 214 Mo. 309; State v. Hamilton, 214 Mo. 315; State v. Long, 214 Mo. 324.

GANTT, P. J.—The defendant was indicted on the 19th day of March, 1908, by the grand jury of the city of St. Louis, for murder in the first degree of Louisa Elschinger, his wife.

On the 24th of March, 1908, the defendant was duly arraigned and entered his plea of not guilty, and the cause was continued to the next term of court. At the April term, 1908, he was put upon his trial and convicted of murder in the first degree, and his punishment assessed at imprisonment in the penitentiary for life. Motions for new trial and in arrest of judgment were duly filed and overruled and the defendant sentenced in conformity with the verdict. From that sentence he has appealed to this court.

On May 5, 1908, defendant was given ninety days in which to file his bill of exceptions. No bill of exceptions was filed within the time granted and it appears that on September 5, 1908, the following order was made and entered upon the record of the circuit court.

"Saturday, September 5th, 1908.
"State of Missouri, vs. Charles Elschinger.
"MURDER IN THE FIRST DEGREE.

"Now on this day it appearing from the affidavit filed by the attorney for the above-named defendant, filed this 5th day of September, 1908, that the clerk of this court inadvertently failed to enter an order of this court made on the 5th day of August, 1908, granting additional time in which to file bill of exceptions in this cause. It is now hereby ordered by the court, subject to the action of the court, upon the application for amendment of record concerning the bill of exceptions herein, that the following order be entered *nunc pro. tunc* and for the said date, to conform with the facts and proceedings in this cause, to-wit: It is this day ordered by the court that the time heretofore granted defendant to file his bill of exceptions herein, on or be-

fore the fifth day of August, 1908, be extended up to the
fifth day of October, 1908, in the October term, 1908, of
said court, and that when so filed the same to have the
same force and effect as if filed on the fifth day of Au-
gust, 1908.''

What purports to be the bill of exceptions in the
cause was filed on October 5, 1908. If the bill of excep-
tions shall be considered as a part of the record, it ap-
pears that several of the jurors upon their *voir dire*
examination, stated that under no circumstances would
they return a verdict assessing the death penalty.
Thereupon on the challenge of the State these jurors
were excused and the defendant excepted to the action
of the court.

The evidence on behalf of the State tended to show
that the defendant, for about three months prior to the
6th of March, 1908, the date of the homicide, had been
conducting a saloon at 738 South Broadway, in the city
of St. Louis. The defendant and the deceased were
married in November, 1907, and at the time of the kill-
ing of defendant's wife, they were living in rooms
above the defendant's saloon. They each had children
by former marriages. The defendant had invested
eight hundred dollars of the money received by his wife
from the life insurance of her former husband, in his
saloon business. For some time before the date on
which the killing occurred, defendant and deceased had
not lived harmoniously. Different witnesses testified
to assaults which the defendant had made upon his
wife. It seems that differences arose between the de-
fendant and the deceased concerning the repayment to
her of her money, which defendant was using in his
saloon business. About two days before the homicide
the defendant's wife, apparently in an effort to recover
a portion of her money from her husband, took $220
from the saloon. This precipitated a quarrel, in which
the defendant threatened to put his wife out of the
house, but refused to permit her to remove her furni-

ture.   There was also evidence that on this occasion
the defendant assaulted and beat his wife, and on the
following morning another difficulty arose in which the
defendant again assaulted his wife.   On the day before
the homicide, the defendant and his wife engaged in an
altercation in their rooms, in which it appears that the
deceased assaulted the defendant with some cooking
utensils.   They were separated by the bartender, who
took the defendant down in the saloon and they were
followed by the deceased who attempted to attack the
defendant with a cleaver.   She was disarmed and the
pair engaged in a fight which resulted in the arrest of
both.   This was about nine o'clock of the night of March
5th.   The evidence tended to show that the deceased,
at this time, bore numerous marks of violence on her
person.   She gave bond and was released at once, but
the authorities held the defendant, despite the fact that
bond had been given for him, for fear he would renew
the trouble.   On the next morning the defendant was,
released, when he said, "I'll fix her for this."   This
was about 5:45 on the morning that his wife was kill-
ed.   At 7:30 on the same morning, defendant secured
and had ready a moving van, and he and his wife en-
gaged in a heated argument about his right to remove
the saloon stock.   Advised by the officer that both par-
ties would be arrested if the disturbance did not cease,
the defendant left the saloon and proceeded to a pawn
shop on Sixth street and attempted to purchase a re-
volver, but was unsuccessful.   He returned to his
saloon, drank some more whisky, and he and deceased
went upstairs to their apartments.   In a few moments
thereafter, shots were heard in the rooms above the
saloon.   When the officers, attracted by the shots,
reached the apartments, they met defendant coming out
of the parlor with pistol in hand.   He was at once dis-
armed and saying, "Louisa is dead and I am too," fell
to the floor.   His wife was lying in the parlor and dead
when the officers arrived.   The pistol bullet had enter-

ed her head just below or behind the left ear. The defendant was entirely uninjured. Three bullet holes in the ceiling were discovered.

The defendant made a statement in which he said that when he went upstairs just before the shooting, he went into the front room and his wife came in and started after him with a butcher knife in her hand, and she took the gun, and he tried to get it from her, and she fired one shot at him, and that is all he remembered. No other weapon was found in the rooms or on the defendant, except the pistol which was taken from him. All five chambers of the pistol were empty.

There was also evidence on the part of the defendant which tended to show that deceased after being released on bond the night before she was shot and killed, went into the saloon and secured her husband's pistol, which, the evidence tended to show, was, if not the same, like the one with which the shooting was done. Another and different revolver, produced by the defendant's witness, Buth, was more positively identified as the one taken by the deceased from the saloon. This witness found this revolver in a stove which he had bought from among deceased's effects. There was also evidence of assaults by the deceased upon the defendant the night before the shooting.

Defendant in his own behalf testified that the deceased had, on the 5th of March, taken all his ready money, and when he asked for it in order to pay his bills, she declared she was going to keep it. At supper time on this day a difference arose as to whether deceased should make tea instead of coffee, and she became very angry. There was a fire in the range and the defendant insisted that she should utilize it for cooking and turned out the gas stove, which was also burning. Deceased relit the gas and defendant extinguished it again, whereupon she struck the defendant with a pan and a poker. Immediately thereafter the deceased made an assault upon him with a cleaver in

the room below. He testified as to his arrest and detention on the night of the 5th, and on his return to the saloon in the morning he found the money that was in the drawer to be taken and he asked his wife for change to use that day, and she refused to let him have it; that on going upstairs to prepare for the trip to the court in the matter of the disturbance of the night before, his wife attempted to assault him with a butcher knife. He declared that when he then told his wife that she could stay in the rooms and he would leave, that when he turned to get some articles of dress, she struck him in the face with some instrument and he heard a shot, which passed close to his mouth; that a second shot passed near his head; "that he could not hear nothing more; that he did not know nothing at all, dropped, didn't know nothing, swimming in the head and everything."

Defendant denied attempting to purchase the revolver on the morning of the shooting. Defendant also offered some testimony tending to show that his reputation was good.

I. The gravity of the offense and the character of the sentence compel the serious consideration of the court of the proposition which meets us at the very threshold, to-wit, that no matters of exception are reviewable for the reason that the bill of exceptions was not filed within the time allowed by the order of the court, and hence, legally considered, are no part of the record. By reference to the statement, it will be observed that on the 5th day of May, the court by its order of record, made on the day of the granting of the appeal to this court, allowed the defendant ninety days to file his bill of exceptions. Now excluding the 5th of May, the day on which the order was made, ninety days from that date expired on August 3, 1908. The attempt made on September 5, 1908, to save the lapse of time by the entry of a *nunc pro tunc* order purport-

ing to have been made on August 5, 1908, extending the time to October 5, 1908, was utterly futile for the reason that the order, even if it had been made originally on August 5th, would have been inoperative and ineffective to extend the time because the time had lapsed on August 3rd, and nothing that the court could do on August 5th, the term having lapsed, could have imparted any life whatever to the order.

In State v. Eaton, 191 Mo. l. c. 156, it was said: "It is a fundamental principle that courts can exercise judicial functions only at such times and places as are fixed by law, and that the judges of courts can enter no orders in vacation except such as are expressly authorized by statute. [4 Ency. Pl. and Prac., 337, note 2.] . . . It is of grave importance that the records of our courts shall be kept so that all parties interested therein or affected thereby may be able to ascertain by application to the clerk when a judgment has become final or when exceptions have been or will be filed if in vacation."

In State v. Britt, 117 Mo. l. c. 586, it was said: "When the forty days given by the court had expired, the judgment of the circuit court became final; neither the court or the parties had any power, in the absence of an order or stipulation extending the time, to take any other steps in the cause. [State v. Seaton, 106 Mo. 198; State v. Mosley, 116 Mo. 545; State v. Apperson, 115 Mo. 470.]"

These cases all concur in holding, what it would seem on principle would require no citation of authority to show, that when the time granted by the court had elapsed on August 3, 1908, it was entirely out of the power of the court or the parties to invest the court with authority to extend the time for filing the bill of exceptions.

This view of the record obviates any necessity for considering the validity of the *nunc pro tunc* entry of September 5, 1908, on the ground that it was made

without any minute of the judge or the clerk or any paper in the cause which would support such an order.

The law on this point is too well settled to require more than a mere reference to it. It follows that, however serious the consequences to the defendant, it is plain that we are restricted to the record proper and that the alleged exceptions are not before us for review. The indictment is but a rescript of the one approved in State v. Gray, 172 Mo. 430; State v. Wilson, 172 Mo. l. c. 423, 428. The arraignment and the plea of not guilty were in due and regular form and so also are the entries of the impanelment of the jury, the verdict and the sentence of the court.

In the absence of any proper exceptions and of any error in the record proper, we have but one duty to perform, that is, to indulge the presumption that the court performed its duty and gave the defendant a fair and impartial trial.

The judgment of the circuit court is therefore affirmed. *Burgess* and *Fox, JJ.,* concur.